IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JEFFREY ALTMAN, | ) | 1:09-cv-1000  AWI JLT |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **ORDER ON DEFENDANT'S** |
| | ) | **MOTION FOR SUMMARY** |
| HO SPORTS COMPANY, INC., dba | ) | **JUDGMENT** |
| HYPERLITE, and DOES 1 to 100, | ) | |
| | ) | |
| **Defendants.** | ) | (Doc. No. 170) |
| _____ | ) | |

This is a state law products liability action brought by Plaintiff Jeffrey Altman

("Altman") against Defendant HO Sports Company ("HOS").  The case was originally filed in

Kern County, but HOS removed to this Court.  HOS now moves for summary judgment on all

claims alleged against it.  For the reasons that follow, HOS's motion will be granted in part and

denied in part.


**FACTUAL BACKGROUND**[1]

A 2004 article entitled "Wakeboarding Injuries" appeared in the American Journal of

---

[1]"JUMF" refers to "joint undisputed material fact."  Both parties make numerous objections to declarations submitted either in support of, or in opposition to, this motion.  To the extent that the Court cites to or relies on a declaration, or a JUMF that is supported only by a citation to an "objectionable" declaration, such objections are deemed overruled.  However, Altman objects that some of HOS's declarations contain expert testimony that was not properly disclosed or supplemented as required by Rule 26(a)(2).  HOS does not specifically address these objections.  Without an actual response from HOS, the Court will generally sustain the objections for purposes of this motion only.  See Fed. R. Civ. Pro. 37(c)(1).  To the extent that the Court omits a JUMF, Altman's objections will be deemed sustained, or the particular JUMF will be considered irrelevant for purposes of this motion.

1 Sports Medicine ("AJSM"). See Request for Judicial Notice ("RJN") Ex. 2.[2] According to the

2 article, "Wakeboarding began in the mid-1980's as a combination of waterskiing, surfing, and

3 snowboarding." RJN Ex. 2. The article describes wakeboarding as follows:

> Wakeboarding is a relatively new water sport in which the wakeboarder or "rider"
> stands sideways on the wakeboard, similar to the stance used in snowboarding,
> and is pulled by a boat or an overhead cable system. The rider wears boot-like
> bindings that are permanently attached to the wakeboard, and if enough force is
> created, the wakeboarder's foot comes out of the binding, rather than the binding
> releasing from the wakeboard. The rider jumps over the wake of the boat, thus the
> name *wakeboarding*, and can perform various tricks, spins, or flips. Depending
> on the size of the wake and the skill level of the rider, jumping heights of up to 20
> feet can be obtained.

9 RJN Ex. 2.

10     Falls and failing to properly execute a trick are an inherent risk of wakeboarding. See

11 JUMF's 17, 18. Falling or failing to properly execute a maneuver or trick can occur in myriad

12 ways and can be the result of several factors, including human error, the rider attempting

13 maneuvers he is not proficient at, and the dynamic uncontrollable conditions of the sport, such as

14 water conditions, boat driving, wind, and other environmental factors. See JUMF 19. There is

15 an inherent risk of injury or death to the rider from a fall or failing to properly execute a trick.

16 JUMF 20. Falls can result in high impact forces on the rider, either from direct contact with the

17 water or wakeboard. JUMF 21. The extent and application of forces on the rider depends upon a

18 number of factors, including *inter alia* the rider's speed, the particular maneuver or trick

19 attempted, and the movement of the rider's body during the trick sequence. See id. The impact

20 forces can increase depending on the interaction of the board (or one of its edges) with the water.

21 Id. Because wakeboarding involves jumping and landing from a height onto a relatively firm

22 surface, there is also an inherent risk of injury to the rider from the impact forces generated in the

23 landing. JUMF 22. If the landing is less than optimal, e.g. the board strikes the water hard or in

24 a twisting manner or if the body posture is not optimized for absorbing the impact, the risk of

25 _____

26     [2]Altman objects to the request for judicial notice. Specifically, Altman objects to two articles from
wikipedia on the basis that wikipedia is not an adequate source for purposes of judicial notice. See Court's Docket
27 Doc. No. 187. Altman's objections will be sustained. See Crispin v. Christian Audigier, Inc., 717 F.Supp.2d 965,
977 (C.D. Cal. 2010); BP Prods. N. Am. Inc. v. United States, 716 F.Supp.2d 1291, 1295 n.10 (Ct. Intl. Trade
28 2010). However, Altman makes no objection to the Court taking judicial notice of the American Journal of Sports
Medicine article. Accordingly, the Court will consider Exhibit 2, but will not consider exhibits 1 and 3.

1 injury increases, especially to the rider's lower extremities.  See id.  Based on the dynamics of

2 wakeboarding, injuries to a rider's lower extremities, including the ankles and knees, are an

3 inherent risk in the sport of wakeboarding.[3]  JUMF 29.

4       Due to the variation in riders' abilities and skill levels, and variation in riding styles,

5 riders seek different design and performance characteristics from their wakeboarding equipment,

6 including their wakeboards and wakeboard boots/bindings.  JUMF 14.  The design of the

7 wakeboard and wakeboard boots/bindings can affect the riding style and performance of an

8 individual rider.  JUMF 15.  To accommodate riders' varying riding styles, skills, and

9 preferences, wakeboard equipment manufacturers offer a wide range of wakeboards and

10 wakeboard boots, which offer a wide range of performance characteristics.  JUMF 16.  Thus, for

11 example, wakeboard equipment manufacturers offer wakeboard boots with varying degrees of

12 stiffness or flexibility.  Id.

13      Because wakeboard boots are secured to the wakeboard to allow the rider to perform

14 tricks, release occurs when the rider's feet and ankles come out of the boots/bindings.  JUMF 24.

15 In certain types of falls, a wakeboard boot may not release the rider's foot from the wakeboard

16 boot due to the unique forces and dynamics of the particular fall.  See Scott Taylor Dec. ¶ 8.

17 That is, if sufficient tension forces are not present, the lower extremity will not separate from the

18 binding, and release will not occur.  See Van Ee Dec. ¶ 7.  Because of the varied and dynamic

19 nature of wakeboarding falls, it is possible for a rider to be injured if his foot releases from the

20 wakeboard boot, and it is possible for a rider to be injured if his foot does not release from the

21 wakeboard boot.  See Scott Taylor Dec. ¶ 9.

22      To accommodate its customer's varying riding styles, skills, and preferences, HOS

23 manufactures and sells several different wakeboard and wakeboard boot models, which offer a

24 wide range of performance characteristics.  JUMF30.  Thus, for example, HOS manufactures and

25 sells wakeboard boots with varying degrees of stiffness or flexibility.  Id.  In 2008, HOS offered

26 the Atlas wakeboard boot/binding (hereinafter the "Atlas Boot") as part of its product line.

27

28      [3]According to the AJSM article, the most common wakeboarding injuries are tearing of the knee's anterior
cruciate ligament, shoulder dislocations, and sprained ankles.  See RJN Ex. 2.

3

JUMF32.  The Atlas Boot was marketed and sold as a "high performance" boot/binding for use by experienced riders only.  JUMF 33.  As part of HOS's advertising, HOS stated that the Atlas Boot "fits super snug, but the TPU stretch zone allows your feet to release when they should. This is a durable and hard charging high performance classic."  Plaintiff's Ex. K.

Between 1994 and June 22, 2008, Altman was an avid wakeboarder who had been wakeboarding between 800 and 1,000 times.  JUMF's 44, 45.  Altman considered himself to be an "expert" wake boarder, who was experienced, knowledgeable, and could perform a wide array of tricks.[4]  See Altman Depo. 79:4-80:7.  In Altman's experience as a wakeboarder, the injuries seen more often are leg injuries, including ankles and knees.  See id. at 69:14-19.  Altman was not aware of a "huge amount" of ankle injuries, see id., but was aware that knee injuries occur more frequently than any other type of injury.  See id. at 68:9-15.  Altman personally knew people who suffered a broken leg and a broken foot while wakeboarding.  See id. at 39:7-14, 42:7-10.  Further, around July 2006, Altman fractured his left ankle while attempting to perform a back flip while wakeboarding.[5]  JUMF50.  Also, prior to June 2008, Altman had read warnings or statements to the effect that participation in the sport of wakeboarding involves inherent risk of injury or death.  JUMF 49.

Altman sustained an injury on June 22, 2008 while wakeboarding.  See JUMF 1.  Altman was wearing Atlas Boots and using a Hyperlite Monarch wakeboard.[6]  See JUMF 56.  Skyler Dubrow was operating the boat that was towing Altman.  JUMF57.  The boat was traveling at 23.5 mph.  See Altman Depo. 124:4-15.[7]  Altman was doing a trick known as a "front side toe

---

[4]In assessing his skill level, Altman explained that there were the following skill levels:  beginner, intermediate, advanced, expert, and professional.  See Altman Depo. 79:7-10.

[5]In the 2006 accident, Altman's right foot came out of his boot, while the left foot stayed in the boot, which caused his left foot to twist when the wakeboard interacted with the water.  JUMF 51.

[6]The Atlas Boots and the Monarch wakeboard were purchased from HOS employee Ben Simms by Altman's friend, Skyler Dubrow.  See Altman Depo. 95:3-14, 97: 112:25-113:11.  Altman and Dubrow often shared wakeboarding equipment.  See id. at 97:3-5.

[7]Altman testified that he wakeboards at a boat speed of 23.5 mph, and that Dubrow was using the "perfect pass" feature of the speed boat, which appears to be a device akin to "cruise control" on an automobile.  See Altman Depo. 124:4-12.

roll" when the accident occurred.[8]  See Altman Depo. 122:9-12.  Altman felt like he landed short and came down a little tail heavy.  See Altman Depo. 132:22-133:1.  Altman explained that he had a very clean landing in that he went up, came around, landed, his right foot/ankle snapped and fell over, and then he let go of the handle.  See id. at 133:18–25.  Altman explained that his "ankle bent in half," Id. at 133:3-5, and that he felt his ankle bend in half.  Id. at 135:1-4.  Given the way he landed, Altman did not expect his right foot to have released from the Atlas Boots.[9] JUMF 63.  However, Altman testified that he was critical of the Atlas Boot because it "bent in half with my foot in it."  Altman Depo. 136:20-23.  Altman did not expect the Atlas Boots to lock his foot into the boot and allow his ankle to bend in half and break.  See Altman Dec. ¶ 4. When Altman was brought back on board the boat, the ankle bones could be seen pushing against the skin.  See id. at 135:5-19.  Altman was taken to the hospital, and it was determined that he suffered a lateral malleolus fracture in the right ankle with displacement.  See Bhagia Depo. 101:22-102:15; Plaintiff's Ex. T.  The impact of the bottom of Altman's wakeboard with the water created deceleration forces through the wakeboard, the binding, into Altman's lower extremity, including his ankle.  JUMF 65.  The deceleration forces generated from Altman's landing fractured his right ankle.  JUMF 66.

Altman has had to undergo therapy, multiple surgeries, and injections, and has also developed scar tissue and gout, and will likely need to have debridements and ankle replacement surgery.  See Bhagia Depo. 103-107, 114-116, 119-120.  Altman cannot stand for more than a few hours, cannot perform athletics, and his ability to perform in recreational activities will be severely limited.  See id. at 15; Altman Dec. ¶ 5.

The Atlas Boots have a warning label located at the rear of each boot that reads, in part: "WARNING - HIGH PERFORMANCE BINDING: FOR USE BY EXPERIENCED RIDERS

---

[8]A front side toe roll is an aerial invert trick that requires the rider to become airborne off the wake with a toe-side approach and execute a forward flip of one full rotation before landing.  See Scott Taylor Dec. ¶ 12. Preferably, the rider will land the maneuver on the downside of the second wake or past the second wake.  Id.

[9]HOS's biomechanical engineer, Chris Van Ee, has declared that a wakeboard boot would not be expected to release a rider's foot when he or she typically lands because the forces generated by the landing are compressive (downward), which pushes the foot into the bottom of the wakeboard boot, as opposed to pulling it out from the top of the wakeboard boot.  Van Ee Dec. ¶ 20.

1 ONLY.   USE OF THIS PRODUCT AND PARTICIPATION IN THE SPORT INVOLVES

2 INHERENT RISK OF INJURY OR DEATH.   EVEN IF PROPERLY FITTED, THE BINDING

3 MAY OR MAY NOT RELEASE IN A FALL WHICH COULD RESULT IN INJURY.   TO

4 REDUCE RISK … 4) READ OWNERS MANUAL BEFORE USE." See JUMF75.   The

5 warning label is approximately 1" by 2".   See Plaintiff's Ex. AA.   The warning label on the Atlas

6 Boot was developed and approved by the Water Sports Industry Association ("WSIA").

7 JUMF76.   The WSIA is an industry association that is comprised of profit and nonprofit entities

8 associated with water sports, including manufacturers of water ski equipment, manufacturers of

9 wakeboarding equipment, and ski boat manufacturers.   JUMF 77.   This same warning appeared

10 on various HOS boots in 1998, 2001, 2005, 2006, 2007, and 2008.   See Plaintiff's Ex. O; Curtin

11 Depo. 66:14-67:14.   HOS's warnings expert, Robert Taylor, has opined that the warning is

12 appropriate for the Atlas Boots.   See Robert Taylor Depo. 50:16-51:01.[10]   Altman's expert in

13 boot design, Peter Curran, is critical of the warning in that the warning has not changed despite

14 the evolution of boot/binding design.   See Curran Depo. 134:4-9.   Curran is also critical of the

15 language that the foot "may or may not release" because the boot is designed to not release.   See

16 Curran Depo. 150:16-151:6; 153:10-15; Plaintiff's Ex. B.   A Wakeboard and Wakeboard Boot

17 Owner's Manual is included in the packaging of all wakeboard boots sold by HOS, including the

18 Atlas Boots.   JUMF78.   The Owner's Manual for the Atlas Boots includes the following

19 warning:  "The binding, even if properly adjusted, may or may not release in a fall which could

20 result in injury to the ankle, knee, leg, or other parts of the body."   JUMF80.

21        Altman did not read the warnings on the Atlas Boots or in the Owner's Manual prior to

22 using the Atlas Boots.   JUMF 81.[11]   When asked why he did not ask Dubrow for the Atlas Boots

23 

24 [10]HOS cites to page 44 of Robert Taylor's deposition.   However, that page was not provided to the Court.
See Defendant's Ex. K.   As such, page 44 has not been considered by the Court.

25 [11]Altman disputes this JUMF by arguing that he did not feel the need to read the warning labels on the Atlas

26 Boots because HOS put the same warning on the back of every boot in their lines since at least 1998.   Altman cites
the second paragraph of his declaration and his Exhibit O in support of this opposition.   However, Exhibit O is

27 simply a picture of various boots and the warning on each of the boots, and Paragraph 2 of Altman's declaration
simply states that he took the picture of Exhibit O and that he owns the boots pictured therein.   See Plaintiff's Ex. O;

28 Altman Dec. ¶ 2.   This does not address the substance of JUMF 81, nor does it address whether Altman felt the need
to read the Atlas Boots warning.   JUMF 81 is undisputed.

owner's manual, Altman responded that, "99.9% of the population would not read the manual to a pair of boots that you screw into a board." Altman Depo. 186:4-14. When asked why he did not read the manual, Altman testified that, "No one would read them." Id. at 186:19-22. Altman further explained that he did not read the manual because he has been wakeboarding for a long time, he has owned ten plus pairs of boots, the Atlas Boots are no different than other boots, and one puts them on the board and then rides them. See id. at 186:23-187:2. For some of the first boots that Altman purchased, Altman did read the "paperwork" that came with the boots. See Altman Depo. 86:1-13. However, as Altman purchased more boots over the years, he stopped reading the boots' "paperwork." See id. at 86:14-16. While Altman read warnings "early on" in the past, his recollection of the warnings was that the warnings indicated that there are risks involved in wakeboarding. See id. at 87:6-88:10. When asked if he would have used the Atlas Boots if the owner's manual stated that "the binding even if properly adjusted may or may not release in a fall which could result in injury to the ankle, knee, leg or there parts of the body," Altman responded that he was "not sure" and that it would be a "rough call" if he would have used the Atlas Boots.[12] See id. at 187:3-12.

In 2008, HOS considered the Atlas Boot to be the stiffest and most supportive wakeboard boot in its product line because it has one of the highest ankle cuffs and densest durameter of EVA foam inside the boot. JUMF34. The lateral, i.e. side to side, stiffness of the Atlas Boot is comparable to other wakeboard boots available at or near 2008. See Scott Taylor Dec. ¶ 15. While the Atlas Boot has a dense EVA that supports the foot and ankle, this is not the only means of ankle support that the boot provides. JUMF 37. The Atlas Boot has an outer covering made of synthetic leather that extends over and above the rider's ankle, thus providing additional support to the ankle. Id. The boot also has a strap made of TPU rubber that surrounds the rider's lower leg, above the ankle. Id. The strap and the boot's laces can be tightened to provide more support to the ankle. Id. However, Altman's expert Peter Curran has "identified an inconsistent lateral and medial flex pattern in the [Atlas Boots], that leave the ankle unsupported at the cuff of

---

[12]As can be seen above, the language of the hypothetical warning is the same as the warning found in the Atlas Boot's Owner's Manual. See JUMF 80.

the boot." Plaintiff's Ex. B.  Specifically, Curran explained:

> The construction of the [Atlas Boot] is comprised of a supportive lower area, known as the vamp and the quarter.  There is an open area around the ankle area which is only supported by the neoprene inner liner.  Finally, the upper area, or cuff, incorporates a Velcro strap, but with very little in the way of supportive materials built into the boot itself.  By creating a stiff lower area and a soft cuff area with no supportive flex transition, the boot in effect acts as an unsupported hinge just above the ankle bone, the weakest point in the foot-to-leg connection.

id.  Similarly, Altman's treating orthopedist, Dr. Umesh Bhagia, testified that the Atlas Boot seemed "like a really well-padded boot, down around the heel and snug around the foot.  But the part around the ankle was very soft.  And, in fact, between the strap and the part that was holding on the heel, there was a portion that was really almost nonexistent that would allow him to twist or bend or torque in any way it wanted to go."  Bhagia Depo. 65:18-66:4.  That is, the Atlas Boot "allowed the foot to stay in one place and the rest of the ankle and body to move on top of it."  Id. at 124:1-7.  The Atlas Boot also had a strap made of TPU rubber (a synthetic polymer that stretches, but resists tearing) to facilitate the release of the rider's feet in falls in which it might be possible to release from the boots.  JUMF 38.  In certain types of falls, the Atlas Boot will release a rider's foot.  See JUMF 40.  However, Curran opined that, "the tightening systems do not seem to allow the foot to release completely or consistently; rather they are designed to retain the foot into the boot, but still allow micro movement."  Plaintiff's Ex. B.  Dr. Bhagia opined that the design of the Atlas Boot "helped cause" Altman's injury because the Atlas Boot did not release Altman's foot and "because of the softness around the ankle which allows the ankle to twist or bend or supinate which causes the ankle injury."  Bhagia Depo. 78:25-79:7.  Altman's injuries were "consistent with [the] description of the foot being caught in the boot, and the body turning on it."  Id. at 43:10-13.  However, Dr. Bhagia had not formed an opinion about whether the boot should have released under the circumstances of the accident.  See Bhagia Depo. 62:5-10.


## SUMMARY JUDGMENT FRAMEWORK

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

8

Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v.
American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary
judgment bears the initial burden of informing the court of the basis for its motion and of
identifying the portions of the declarations (if any), pleadings, and  discovery that demonstrate an
absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986);
Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it
might affect the outcome of the suit under the governing law.  See Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 248-49 (1986); United States v. Kapp, 564 F.3d 1103, 1114 (9th Cir. 2009).
A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to
return a verdict for the non-moving party.  Anderson, 477 U.S. at 248; Freecycle Sunnyvale v.
Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

      Where the moving party will have the burden of proof on an issue at trial, the movant
must affirmatively demonstrate that no reasonable trier of fact could find other than for the
movant.  Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of
proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential
element of the non-moving party's claim or by merely pointing out that there is an absence of
evidence to support an essential element of the non-moving party's claim.  See James River Ins.
Co. v. Schenk, P.C., 519 F.3d 917, 925 (9th Cir. 2008); Soremekun, 509 F.3d at 984; Nissan Fire
& Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If a moving party fails
to carry its burden of production, then "the non-moving party has no obligation to produce
anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan
Fire, 210 F.3d at 1102-03.  If the moving party meets its initial burden, the burden then shifts to
the opposing party to establish that a genuine issue as to any material fact actually exists.  See
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210
F.3d at 1103.  The opposing party cannot "'rest upon the mere allegations or denials of [its]
pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a
genuine issue for trial.'"  Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir.
2008) (quoting Fed. R. Civ. Pro. 56(e)).

The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel Broad., Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007); Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  Further, a "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'"  Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).  Additionally, the court has the discretion in appropriate circumstances to consider materials that are not properly brought to its attention, but the court is not required to examine the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references.  See Simmons v. Navajo County, 609 F.3d 1011, 1017 (9th Cir. 2010); Gordon v. Virtumundo, Inc., 573 F.3d 1040, 1058 (9th Cir. 2009); Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment.  See Nissan Fire, 210 F.3d at 1103.

## DEFENDANT'S MOTION

**I.      Failure To Warn & Failure To Test**

*Defendant's Argument*

HOS argues *inter alia* that there is no evidence that any defect in the warnings or testing

1  caused injury.  Altman's experts have not opined regarding whether any inadequacy in the

2  warnings caused Altman's injuries.  Also, Altman did not read the warnings on the back of the

3  Atlas Boots or the Owner's Manual.  Altman indicated that the Atlas Boots were no different

4  than other boots that he had used, and that one puts the boots on and then rides them.

5  *Plaintiff's Opposition*

6  Altman argues *inter alia* that he has used various HOS boots that were made in 1998,

7  2001, 2003, 2005, 2006, and 2008.  Altman did not read the warning labels on the Atlas Boot

8  because the warning labels are the same that have been on HOS boots since 1998.  The reason

9  that he did not need to read the warnings was due to the fact that the warnings did not change.

10  The warnings should have changed in order to account for the changes in wakeboard boot design

11  and technology.  Altman states that he claims "that the failure of [HOS] to make any changes to

12  its warnings over the years directly impacted his willingness to read the warnings."  Opposition

13  at 17:9-11.  Further, the actual dimensions of the warning on the Atlas Boot is 1" by 2".

14  *Legal Standard*

15  A manufacturer may be held strictly liable where its product has a "warning defect," that

16  is, an inadequate warning or a failure to warn.  Anderson v. Owens-Corning Fiberglass Co. 53

17  Cal.3d 987, 995 (1991).  Manufacturers are strictly liable for injuries caused by their failure to

18  warn of known or reasonably scientifically knowable dangers at the time they manufactured and

19  distributed their product.  Johnson v. American Standard, Inc., 43 Cal.4th 56, 64 (2008); Carlin

20  v. Superior Court, 13 Cal.4th 1104, 1108-09 (1996).  However, a manufacturer is not required to

21  warn "against every conceivable" risk associated with the use of its product, and it is "necessary

22  to weigh the degree of danger involved when determining whether a warning defect exists."

23  Wright v. Stang Mfg. Co., 54 Cal.App.4th 1218, 1230 (1997); Schwoerer v. Union Oil Co., 14

24  Cal.App.4th 103, 112 (1993).  Liability for a warning defect "does not attach if the dangerous

25  propensity is either obvious or known to the injured person at the time he uses the product."

26  Burke v. Almaden Vineyards, Inc., 86 Cal.App.3d 768, 772 (1978); see also Johnson, 43 Cal.4th

27  at 65-67; Bojorquez v. House of Toys, Inc., 62 Cal.App.3d 930, 933-34 (1976).  The adequacy of

28  a warning is generally a question of fact.  See  Oxford v. Foster Wheeler, LLC, 177 Cal.App.4th

700, 717 (2009); Schwoerer, 14 Cal.App.4th at 111.  Further, a manufacturer is liable only when a defect in its product was a legal cause of injury, that is, when the defect is a substantial factor in producing the injury.  Soule v. General Motors Corp., 8 Cal.4th 548, 572 (1994); Torres v. Xomox Corp., 49 Cal.App.4th 1, 18 (1998).  Thus, a "plaintiff must prove that the defendant's failure to warn was a substantial factor in causing his or her injury."  Huitt v. Southern California Gas Co., 188 Cal.App.4th 1586, 1604 (2010); see also Torres., 49 Cal.App.4th at 18.  Generally, when a warning is given, but the person to whom the warning is directed does not read the warning, there is no causation.  See Motus v. Pfizer Inc., 358 F.3d 659, 661 (9th Cir. 2004); Alfano v. BRP Inc., 2010 U.S. Dist. LEXIS 64182, *6-*7 (E.D. Cal. June 3, 2010); Ramirez v. Plough, Inc., 6 Cal.4th 539, 555-56 (1993); Conte v. Wyeth, Inc., 168 Cal.App.4th 89, 112 (2008).

### Discussion

There is a problem with causation.  It is undisputed that Altman did not read either the warning that appears on the Atlas Boot itself or the warning that appears in the Owner's Manual. See JUMF 81.  Since Altman did not read either warning, it would appear that any defect or inadequacy in the warnings could not have been a substantial factor in Altman's injury.[13]  See Motus, 358 F.3d at 661; Alfano, 2010 U.S. Dist. LEXIS 64182 at *6-*7; Ramirez, 6 Cal.4th at 555-56; Conte, 168 Cal.App.4th at 112; Contois v. Aluminum Precision Prods., 2008 Cal. App. Unpub. LEXIS 9659, *10 (Dec. 1, 2008).[14]  To address this shortcoming, Altman argues that there was no need for him to read the warnings because the warnings never changed, and it was the failure of the warnings to change that directly impacted his willingness to read the warnings. The Court is not convinced by Altman's arguments.

---

[13] The "failure to properly test" aspect of this cause of action relates to the adequacy of the warnings of the Atlas Boots.  Specifically, the active complaint alleges that HOS failed to conduct adequate testing, but had they done so, HOS "could have issued adequate warnings to their consumers about the inherent risk to their feet and ankles in using the Atlas [Boot] . . . ."  Court's Docket Doc. No. 41 at ¶ 21.  Paragraph 21 continues that HOS could have developed a snowboard-like boot that would have avoided unnecessary foot and ankle injuries.  See id. However, such an allegation is tantamount to alleging that the Atlas Boot suffers from a design defect.

[14] The Court is not bound by state rules regarding unpublished cases, and may consider unpublished cases as persuasive authority.  Employers Ins., 330 F.3d at 1220 n.8; Grant v. Aurora Loan Servs., 736 F.Supp.2d 1257, 1272 n.53 (C.D. Cal. 2010); Roe v. Gustine Unified Sch. Dist., 678 F.Supp.2d 1008, 1042 n.29 (E.D. Cal. 2009).

Altman has produced evidence that he owned various HOS boots in 1998, 2001, 2003, 2005, 2006, and 2008. See Altman Dec. ¶ 2; Plaintiff's Ex. O. Altman has also shown that the warnings that appeared on each of these different boots were essentially identical to the warning on the Atlas Boot. Cf. JUMF 75 with Plaintiff's Exs. N, O. However, that is as far as his evidence goes. There is no evidence that Altman actually knew that the warnings on HOS's boots remained the same from 1998 forward, and there is no evidence that indicates Altman was unwilling to read the warnings because the warnings stayed the same. Instead, the evidence shows that Altman did not read the warnings because, in his opinion, 99.9% of the population would not read the warnings, and because he believed that the boots were no different from the other boots that he had owned and worn. See Altman Depo. 186:4-187:2. In other words, the evidence shows that Altman did not read the warnings because he felt that he knew enough about wakeboard boots and simply did not need to read the warnings. Altman's contention that his willingness to read was negatively affected by the unchanging nature of the warnings is simply the unsupported argument of counsel, which cannot create genuine disputed fact. See Exeter Bancorporation, Inc. v. Kemper Secs. Group, Inc., 58 F.3d 1306, 1312 n.5 (8th Cir. 1995); Angel v. Seattle-First Nat'l Bank, 653 F.2d 1293, 1299 (9th Cir. 1982); British Airways Bd. v. Boeing Co., 585 F.2d 946, 951-52 (9th Cir. 1978).

Altman's contention that he did not need to read the warnings because they stayed the same is also unpersuasive. First, the contention does not change the fact that Altman simply did not read the warnings. If he did not read the Atlas Boot's warnings, he could not have been affected by any deficiency therein. Second, from Altman's deposition, it is apparent that he has not read the warnings, either on the various HOS boots or in the manuals, for years. When asked a question that incorporated the Atlas Boot Owner's Manual warning, Altman stated that it would be a "rough call" and he was "not sure" whether he would have used the Atlas Boots had he been aware of that warning. See Altman Depo. 187:3-12. If the warnings had not changed, and he was aware of the warnings, then Altman's answer should not have been in essence, "I don't know." His answer should have been that the warning would not have prevented him from using the Atlas Boots that day because it was the same warning associated with his previous

boots.  While he read warnings and "paperwork" early in his wakeboarding endeavors, and remembered that the warnings stated generally that there are inherent risks in wakeboarding, Altman did not testify that he was relying on or considering anything in those warnings.

Finally, Altman mentions that the dimensions of the warning on the Atlas Boot are 1" by 2" and that the font is small.  California courts have indicated that a manufacturer may be liable for the failure to give appropriate and conspicuous warnings.  See Gonzales v. Carmenita Ford Truck Sales, Inc., 192 Cal.App.2d 1143, 1147 (1987); Burke v. Almaden Vineyards, 86 Cal.App.3d 768, 772 (1978).  However, Altman merely points out the dimensions of the warning and states that HOS has made the warning significantly larger in its memorandum than how the warning actually appears.  Altman makes no argument that the warning was too small or insufficiently conspicuous, and that this lack of conspicuousness is the reason that he failed to read the warning.  As discussed above, the reason Altman did not read the warnings appears to be his experience with wakeboard boots over the years.  See Altman Depo. 186:4-187:2.  In the absence of evidence and argument from Altman, the dimensions of the warning on the Atlas Boots do not create a triable issue of material fact.

Any shortcomings or deficiencies in the Atlas Boot's warnings, either the warning on the Atlas Boot itself or the warning in the Owner's Manual, do not matter because Altman never read them.  Because Altman did not read the Atlas Boot's warnings, "there is no conceivable causal connection between the representations or omissions that accompanied the product and plaintiff's injury."  Ramirez, 6 Cal.4th at 555-56.  Summary judgment in favor of HOS on Altman's failure to properly warn and test cause of action is appropriate.  See Motus, 358 F.3d at 661; Alfano, 2010 U.S. Dist. LEXIS 64182 at *6-*7; Ramirez, 6 Cal.4th at 555-56; Conte, 168 Cal.App.4th at 112; Contois, 2008 Cal. App. Unpub. LEXIS 9659 at *10.

## II.     Assumption of the Risk

### *Defendant's Argument*

HOS argues that the primary assumption of the risk doctrine applies to bar Altman's claims.  The inherent risk of injury in wakeboarding is falling or landing a trick in a less than

optimal way.  There is no way to eliminate this risk without altering the nature of wakeboarding or deterring vigorous participation.  Because of the varied and dynamic ways in which falls occur and tricks are performed, there is a risk of injury regardless of whether the boot releases during the fall.  If the boot/binding were made to release easier, this would change performance of the boot while not eliminating the risk of injury.  Similarly, making the boot/binding "exceptionally stiff" would change the performance of the boot, while not eliminating the risk of injury.  A stiffer boot could lead to more leg and knee injuries instead of ankle injuries.  There is no optimal design that will prevent all injuries from wakeboarding.  The risk of injury is properly and voluntarily assumed by the wakeboarder, and HOS did not escalate the risk of harm beyond the inherent risk in wakeboarding.

### *Plaintiff's Opposition*

Altman argues that the injury he suffered is not an inherent risk of wakeboarding.  Dr. Bhagia testified that boots are designed to prevent this type of injury, and HOS offers no contrary opinions.  Further, despite HOS's representation that the Atlas was the "stiffest" boot in the line, there was in fact a boot that had removable battens (the Murray model), which provided more support and stiffness than the Atlas's cloth-like hinge.  Also, Altman was not aware that he could suffer his ankle injury by wearing the Atlas Boots.  If he had known of the risk, he would not have used the Atlas Boots.  Finally, the Atlas Boots increased the risk of injury beyond that which is inherent in wakeboarding.

### *Legal Standard*

"Manufacturers have an independent duty to make nondefective products that as a general rule will withstand application of primary assumption of risk principles."  Ford v. Polaris Indus., Inc., 139 Cal.App.4th 755, 771 (2006).  In a recreational equipment defect case where the purported defect is a failure of the product to eliminate or provide protection against an inherent risk of the sport, the court must assess the risks inherent in the sport "as part and parcel of ascertaining the scope of the manufacturer's duty."  Id.  Determining the inherent risks in a particular sport is "integral" to determining the defendant's duty of care.  See id.  "'Inherent' means involved in the constitution or essential character of something: belonging by nature or

habit: intrinsic," and an 'inherent risk' is a risk that, "if eliminated, would fundamentally alter the nature of the sport or deter vigorous participation." Id. at 771-72.  Generally, the duty of a recreational equipment manufacturer to design nondefective equipment may be expressed either in terms of a duty to not increase the particular sport's inherent risks, or in terms of taking reasonable steps to minimize the particular sport's inherent risks while not altering the nature of the sport.  See id. at 774-75.

*Discussion*

In this case, there is no real genuine dispute that the inherent risks of wakeboarding include falling, failing to execute a trick properly, and lower extremity injuries due to the forces that impact a wakeboarder from falling and/or failing to land a trick properly.  See JUMF's 17-22, 29.  The most common lower extremity injuries appear to be tearing of the knee's anterior cruciate ligament and sprained ankles.  See RJN Ex. 2.  The AJSM article  includes Table 2, which indicates that of 152 reported injuries, 2 included a fractured lateral malleolus.  See RJN Ex. 2.  That is, approximately 1.3% of the reported injuries on Table 2 are similar to Altman's injury.  In Table 4 of the AJSM article, 82 injuries are represented, none include a fractured lateral malleolus, but there are 4 instances of "fractured ankle" reported.  See id.  Although Altman fractured his left ankle while wakeboarding in 2006, it does not appear that the 2006 fracture is the same type of fracture that he suffered in 2008.  Cf. JUMF 50 with Bhagia Depo. 108:5-109:19.  While ankle injuries in general appear to be an inherent risk of wakeboarding, it is not clear at this point that Altman's particular fracture fits under the general inherent risks of wakeboarding.

Nevertheless, assuming that the ankle injury suffered by Altman fits under the inherent risks of wakeboarding, and viewing the evidence in the light most favorable to Altman as the non-moving party, the evidence from Dr. Bhagia and Peter Curran create genuine disputed issues of material fact.  In particular, Curran has opined in part that, "By creating a stiff lower area and a soft cuff area with no supportive flex transition, the boot in effect acts as an unsupported hinge just above the ankle bone, the weakest point in the foot-to-leg connection."  Plaintiff's Ex. B. Similarly, Dr. Bhagia from an orthopedic perspective opined that "the part around the ankle was

1  very soft.  And, in fact, between the strap and the part that was holding on the heel, there was a

2  portion that was really almost nonexistent that would allow him to twist or bend or torque in any

3  way it wanted to go."  Bhagia Depo. 65:18-66:4.  Considering the forces that may be in effect

4  while attempting to land a trick or when falling, if the Atlas Boot creates in essence an

5  unsupported hinge just above the weakest point of the lower extremities, it could reasonably be

6  concluded that such a design actually increases the risk of danger of suffering ankle injuries

7  because it allows the rider twist, bend, or torque in any way at the weakest point.  Summary

8  judgement on this issue is inappropriate.  See Ford, 139 Cal.App.4th at 774-75.

9

10  **III.    Causation**

11        *Defendant's Argument*

12        HOS argues that Altman must show that a defect in the product substantially contributed

13  to his injuries in order to recover.  Causation must be established beyond a mere possibility, but

14  instead must reach a level of reasonable probability.  Here, simply because Altman was wearing

15  the Atlas Boots does not mean that the boots caused the injury, especially since it is widely

16  recognized that ankle injury is an inherent risk of wakeboarding.  The evidence shows that a

17  rider's foot can release from the Atlas Boots, and biomechanical testing showed that the stiffness

18  of the Atlas Boot is comparable to other wakeboard boots that were available around June 2008.

19  Also, Dr. Bhagia is not competent to testify that the boot caused Altman's injury.  Bhagia knows

20  little about wakeboarding, did not perform an analysis of the wakeboard boots, does not know

21  how the accident occurred, does not know how fast Altman was traveling, and did not know the

22  particular trick that Altman was attempting to perform.  Bhagia's opinions are formed in a

23  vacuum.  Further, Bhagia has not opined that the design of the boots caused the injury, rather he

24  simply states that a stiffer boot or a boot that allows for release might have prevented the injury.

25  Moreover, a stiffer boot would have increased the risk of injury above the ankle, and there are no

26  indications that this injury would have been averted.

27        *Plaintiff's Opposition*

28        Altman argues that causation is an issue that is properly left to the trier of fact.  Dr.

Bhagia opined to a reasonable degree of medical certainty that the ankle injury was caused by the Atlas Boots.  HOS has no contrary orthopedic opinion.  Further, HOS does not fully reveal the full extent of Dr. Bhagia's analysis and investigation.  Dr. Bhagia saw the trick that Altman was attempting to perform and saw Altman wearing that Atlas Boots, yet Dr. Bhagia's testimony remained unchanged.[15]  Dr. Bhagia's testimony defeats summary judgment.

### *Legal Standard*

Under the "design defect" theory of products liability, a design is defective in one of two ways.  Soule v. General Motors Corp., 8 Cal.4th 548, 566-67 (1994); Karlsson v. Ford Motor Co., 140 Cal.App.4th 1202, 1208 (2006).  First, under the "consumer expectations test," a product's design is defective if it has failed to perform as safely as its ordinary consumers would expect when used in an intended or reasonably foreseeable manner.  Barker v. Lull Engineering Co., 20 Cal.3d 413, 430 (1978); Karlsson, 140 Cal.App.4th at 1208.  "[T]he consumer expectations test is reserved for cases in which the everyday experience of the product's users permits a conclusion that the product's design violated minimum safety assumptions, and is thus defective regardless of expert opinion about the merits of the design."  Soule, 8 Cal.4th at 567; McCabe v. American Honda Motor Co., 100 Cal. App. 4th 1111, 1121 (2002). Second, under the "risk-benefit test," a product's design is defective if the design embodies "excessive preventable danger," that is, the risk of danger inherent in the design outweighs the benefits of such design. Barker, 20 Cal.3d at 430; Ford v. Polaris Industries, Inc., 139 Cal.App.4th 755, 766 (2006).  A manufacturer is liable only when a defect in its product was a legal cause of injury, that is, when the defect is a substantial factor in producing the injury.  Soule, 8 Cal.4th at 572.  Under both the risk benefits test and the consumer expectation test, the plaintiff must establish a prima facie case of causation.  Campbell v. General Motors Corp., 32 Cal.3d 112, 119 (1982); Visueta v. General Motors Corp., 234 Cal.App.3d 1609, 1612 n.2 (1991) (risk benefits test); Vermeulen v. Superior Court, 204 Cal.App.3d 1192, 1198 (1988) (consumer expectations test).  To establish a prima

---

[15]Dr. Bhagia's testimony covers two volumes.  The first volume was taken on September 16, 2010.  See Plaintiff's Ex. D.  The second volume was taken on October 14, 2010.  See  Plaintiff's Ex. G.  At the time of the first volume, Dr. Bhagia was not aware of the trick that Altman was attempting.  At the time of the second volume, Dr. Bhagia had viewed a videotape of the front side toe roll.

facie case of causation, the plaintiff must adduce evidence which would permit a jury to find that a design feature was a substantial factor of plaintiff's injury.  See Soule, 8 Cal.4th at 572; Campbell, 32 Cal.3d at 119; Visueta, 234 Cal.App.3d at 12 n.2.  Causation is ordinarily a question of fact for the jury.  Cardinal Health 301, Inc. v. Tyco Electronics Corp., 169 Cal.App.4th 116, 146 (2009); Lombardo v. Huysentruyt, 91 Cal.App.4th 656, 666 (2001).

    *Discussion*

    Causation is generally, although not always, an issue for the trier of fact.  See Lombardo, 91 Cal.App.4th at 666.  The general rule applies in this case.  After reviewing the evidence presented, the Court believes that Altman has presented sufficient evidence that a reasonable jury could conclude that the Atlas Boot design was as substantial factor in causing Altman's ankle injury.

    As discussed above, Curran was critical of the Atlas Boot because it left the ankle unsupported at the cuff.  Plaintiff's Ex. B.  As quoted above, Curran opined that, "By creating a stiff lower area and a soft cuff area with no supportive flex transition, the boot in effect acts as an unsupported hinge just above the ankle bone, the weakest point in the foot-to-leg connection."  A hinge is a type of joint that permits bending or swinging.  Cf. Merriam Webster's On-Line Dictionary (definition of "hinge" ).  Curran thus suggests that the Atlas Boot's design permits for a bending or swinging between the wakeboard and the body at or near the ankle.  This is consistent with Dr. Bhagia observation that, "between the strap and the part that was holding on the heel, there was a portion that was really almost nonexistent that would allow him to twist or bend or torque in any way it wanted to go."  Bhagia Depo. 65:18-66:4.

    Altman's description of the injury appears consistent Curran's criticism and Dr. Bhagia's observation.  Altman testified that he landed from the flip, that his right foot/ankle snapped and fell over, and then he released the handle.  See Altman Depo. at 133:18–25.  Altman stated that his "ankle bent in half," and that he felt his ankle bend in half.  Id. at 133:3-5, 135:1-4.  Altman also declared that he did not expect the Atlas Boots to lock his foot into the boot and allow his ankle to bend in half and break, see Altman Dec. ¶ 4, and also testified that he was critical of the Atlas Boot because it "bent in half with my foot in it."  Altman Depo. 136:20-23.  An ankle

"bending in half" would seem to be a possible result of a boot that creates an unsupported hinge near the ankle and that allows a person to be twisted, turned, and torqued in any direction.

Dr. Bhagia opined that the design of the Atlas Boot "helped cause" Altman's injury because the Atlas Boot did not release Altman's foot and "because of the softness around the ankle which allows the ankle to twist or bend or supinate which causes the ankle injury." Bhagia Depo. 78:25-79:7; see also Plaintiff's Ex. E. Altman's injuries were "consistent with [the] description of the foot being caught in the boot, and the body turning on it." Id. at 43:10-13. This would also appear to be consistent with Curran's concern that the Atlas Boot created an unsupported hinge. Dr. Bhagia explained that one of the issues to him was that, "if there was some way that the foot and ankle would move together as one rather than the foot being caught in the boot and the ankle moving on top of it . . . [and] the way [the Atlas Boot] was, it allowed the foot to stay in one place the rest of the ankle and body to move on top of it." Id. at 124:1-7. Dr. Bhagia also testified that Altman's ankle injury is not common in sports that have foot or ankle supports. See id. at 46:24-47:4. Dr. Bhagia holds his opinions to a reasonable degree of medical certainty. See id. at 76:24-77:2.

HOS attacks the opinions of Dr. Bhagia as being unreliable and as having been formed in a vacuum without reference to what Altman was actually doing. The Court cannot agree. As part of his work in this case, in addition to actually providing medical treatment to Altman for this injury, Dr. Bhagia performed a visual inspection of the Atlas Boots, manipulated the boots with his hands, viewed Altman wearing the boots while on the wakeboard, had Altman move in several directions while wearing the boots, and viewed a video of the trick that Altman attempted to perform (the toe-side-front roll). See id. at 11-12, 66, 122-123. Dr. Bhagia also recalled reading articles in sports medicine journals that indicated that the most common injuries in wakeboarding are lacerations, knee sprains, and ankle sprains, but not ankle fractures. See id. at 32:1-18. While Dr. Bhagia did not conduct biomechanical tests, his testimony is from the medical discipline of orthopedics. As such, Dr. Bhagia would appear to be qualified to opine about ankle fractures in general, the types of ankle fractures, the causes of ankle fractures, the various ankle supports, and the treatment for ankle fractures. Based on his knowledge of the

1   nature of Altman's fracture, his examination of the Atlas Boots, and his listening to Altman's

2   description of the accident/injury, Dr. Bhagia opining that Altman's fracture appears to be the

3   result of the Atlas Boot holding Altman's foot in place and allowing the body to roll over the

4   ankle, all while providing little support to the ankle, does not seem to be outside the realm of

5   orthopedics.

6           Additionally, HOS's contention that the Atlas Boot's stiffness was comparable to other

7   available boots is not persuasive.  First, it is not clear what "comparable" means precisely, and

8   there is no evidence regarding the other boots, other than they were comparable in stiffness.

9   Second, the *Ford* case rejected the proposition that liability may be avoided simply because a

10   manufacturer's equipment is more or less the same as the equipment of other manufacturers.

11   See Ford, 139 Cal.App.4th at 773.  The *Ford* court observed that, like here, no cases had been

12   cited that "stand for the proposition that primary assumption of the risk will preclude a strict

13   products liability/design defect claim against a recreational equipment manufacturer simply

14   because its equipment is 'essentially the same' in design as that of other manufacturers."  Id.

15   Third, that other boots might have comparable stiffness does not address the criticism that the

16   Atlas Boot in particular creates an unsupported hinge at or near the weakest point of the lower

17   extremities.  See Plaintiff's Ex. B.

18           Finally, citing JUMF's 73 and 74, HOS argues that there is no indication that a stiffer

19   boot would have averted Altman's injury.  The Court takes this argument to mean that Altman's

20   injury would have occurred irrespective of the Atlas Boot's design.  However, JUMF's 73 and 74

21   do not state that there is no indication that Altman's ankle injury would have been averted.  See

22   JUMF's 73, 74.[16]  Further, both JUMF 73 and JUMF 74 rely on a paragraph of Dr. Van Ee's

23   declaration that is objected to as being a violation of Rule 26(a)(2)'s expert disclosure

24   requirements.  See Footnote 1, *supra*.  JUMF 72 comes closer to supporting HOS's argument.

25   JUMF 72 posits that Dr. Bhagia could not say whether a stiffer boot would have prevented

26

27      [16]JUMF 73 reads in full: "If Plaintiff's ankle had been rigidly supported during the landing, the impact forces would have been transferred up the lower extremity, dramatically increasing the risk for injuries above the

28   ankle, such as his leg or knee."  JUMF 74 reads in full:  "If the Atlas Boot was stiffer or more rigid, it is possible that Plaintiff still would have sustained injuries in this accident."

1  Altman's ankle injury.  See JUMF 72.  HOS cites sections from pages 64, 79, and 80 of Dr.

2  Bhagia's deposition.  However, page 64 lines 11 to 20 address whether "any injuries" would

3  have been sustained in the accident if the boot had been stiffer, it does not ask about the injury

4  Altman actually sustained.  Page 79 lines 12 to 19, are to the same effect, and asks only about

5  whether Dr. Bhagia has an opinion whether "other injuries" would have been sustained.  Page 79

6  lines 21, to page 80 line 6, are different from the other excerpts.  Dr. Bhagia was asked about the

7  section of his expert report where he indicates that a stiffer boot or a boot that would allow the

8  foot to escape "might have prevented the injury."  Dr. Bhagia was asked, "I take it your use of the

9  word 'might' because you don't know one way or the other.  Is that correct?"  Dr. Bhagia

10  responded, "Right.  I mean, is it possible?  Yes.  That it can cause an injury regardless of any

11  boot.  But it reduces the likelihood if it is reinforced."  This testimony is somewhat ambiguous.

12  The testimony is not in terms of "more likely than not," rather Dr. Bhagia seems to be responding

13  that it is merely "possible" that the injury would have still occurred.  At other points in the

14  deposition, Dr. Bhagia testified that he held the opinions in his report to a reasonable medical

15  confidence, see Bhagia Depo. 76:24-77:2, and also testified that a stiffer boot or a boot that

16  releases "would have prevented the injury."  See id. at 64:3-9.  These sections of the deposition

17  suggest that Dr. Bhagia is only testifying at pages 79 to 80 that it is merely "possible" that

18  Altman's injury could have occurred with a stiffer boot.  "Possible" is not the same as

19  "probable."  See Miranda v. Bomel Construction Co., Inc., 187 Cal.App.4th 1326, 1336 (2010).

20  As presented, Dr. Bhagia's testimony is not sufficiently clear for the Court to conclude that the

21  injury would have occurred regardless of the Atlas Boot's design.[17]

22          In sum, Altman's evidence could support a conclusion that the design of the Atlas Boot

23  was a substantial factor in causing the ankle injury.  Contrary to HOS's assertion, the evidence is

24  more than simply Altman was wearing Atlas Boots when he was injured.  Viewing the evidence

25  in the light most favorable to Altman, and as the Court understands the evidence presented, it

26  could be concluded that the Atlas Boot created an unsupported hinge at or near the ankle, and

27

28          [17]To the extent that HOS may be contending that Altman is required to put forth an alternative design, such
a contention is misplaced.  "[I]t is not the plaintiff's burden in a design defect case to prove the existence of a feasible
alternative design."  Ford, 139 Cal.App.4th at 772 n.11.

also locked the foot to wakeboard and provided little support to the ankle.  When Altman landed, his ankle was the hinge point, and the Atlas Boot focused the energy on the hinge point, which happens to be at or near the weakest point of the lower extremity.  The ankle then bent in half because the boot kept the entire foot in place.  Under this view of the evidence, the Atlas Boot design would be a substantial factor in causing Altman's ankle injury.  Accordingly, summary judgment on this theory is inappropriate.

## CONCLUSION

HOS moves for summary judgment on the claims against it.  With respect to Altman's failure to properly warn and test cause of action, the evidence shows that Altman did not read the warnings provided either on the Atlas Boots themselves or in the Atlas Boots Owner's Manual. Generally, when a plaintiff does not read a product's warnings, no defect or inadequacy in the warning can be a substantial factor in causing injury.  Since there is a failure of causation, summary judgment in favor of HOS on this cause of action will be granted.

With respect to summary judgment on the design defect cause of action on the basis of assumption of the risk, assuming that Altman's particular ankle fracture is an inherent risk of wakeboarding, the evidence viewed in the light most favorable to Altman suggests that the Atlas Boot increases the inherent risk of injury by creating an unsupported hinge at the weakest point of the lower extremities.  Because the evidence suggests an increase in the inherent risk, summary judgment on this theory will not be granted.

With respect to summary judgment on the design defect cause of action on the basis of a failure of causation, the opinions and testimony of Altman, Curran, and Dr. Bhagia suggest that the Atlas Boots' design was a substantial factor in causing the injury.  As such, summary judgment on this theory will not be granted.

//

//

//

Accordingly, IT IS HEREBY ORDERED that:

1.    Defendant's motion for summary judgment on Plaintiff's failure to properly warn and test cause of action is GRANTED; and

2.    Defendant's motion for summary judgment in all other respects is DENIED.

IT IS SO ORDERED.

Dated:    May 17, 2011

_____
CHIEF UNITED STATES DISTRICT JUDGE

24